**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-17-00417-CV**

_____

**IN THE INTEREST OF F.L.S.**

_____

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 17-02-02047-CV**

_____

**MEMORANDUM OPINION**

R.S., paternal grandmother of F.L.S., appeals from the Final Order of Termination in Suit Affecting the Parent-Child Relationship and from the Order Granting Petitioner's Motion to Strike Original Petition in Intervention for Conservatorship of a Child.[1] Neither F.L.S.'s mother, J.W., nor F.L.S.'s alleged father, J.S., appealed the termination.

---

[1] To preserve the parties' privacy, we refer to the parties and to the child by their initials. *See* Tex. Fam. Code Ann. § 109.002(d) (West Supp. 2017); Tex. R. App. P. 9.8.

Background

F.L.S. was born on October 4, 2015. On February 15, 2017, the Department of Family and Protective Services ("the Department") filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship, seeking, among other things, to be immediately named temporary sole managing conservator of F.L.S. and the termination of the parental rights of F.L.S.'s mother, J.W., and F.L.S.'s alleged father, J.S. The Petition listed R.S., F.L.S.'s paternal grandmother, and R.H., F.L.S.'s paternal step-grandfather, as guardians of the child.

According to the Affidavit in Support of Removal attached to the Petition ("the affidavit"), R.S. and R.H. (collectively "the paternal grandparents")[2] were caring for F.L.S., and the paternal grandparents reported that they had been taking care of F.L.S. since her discharge from the hospital. The paternal grandparents indicated that J.W. "verbally gave [the paternal grandparents] custody of [F.L.S.] three days after she was born[]" because J.W. could not properly care for the child's medical needs. The affidavit stated that F.L.S. was born preterm and suffers from

---

[2] We note that although the petition names J.S. as F.L.S.'s alleged father, the final termination order names J.S. as F.L.S.'s father. Therefore, in this opinion we refer to R.S. and R.H. as the "the paternal grandparents."

"Intraventricular hemorrhage (IVH), Langerhans cell histiocytosis (LCH), compromised hearing, and developmental delay in communication."

The affidavit alleged that on November 8, 2016, the Department received a referral alleging medical neglect of F.L.S. by the paternal grandparents after F.L.S. had missed "multiple appointments with [the] PCP and specialists[,]" and the affidavit stated that "continued inconsistent lack of medical care . . . and in[]adequate lab work to monitor the child could result in serious permanent damage and further complications[.]" The affidavit explained that the referral report alleged concerns "of repeated phone calls from medical caregivers and voicemails left with the grandparents that [were] not answered."

The affidavit also reported a second referral on November 10, 2016, alleging sexual abuse of F.L.S. by R.H. (the paternal step-grandfather) "due to high levels of testosterone in the child's lab work: [F.L.S.] is showing accelerated growth, acne, pubic hair, and clitoromegaly[,]" and "[a] concern was expressed following the caretaker-step-grandfather's ([R.H.]) self-admission to using testosterone applications himself, which could be transferring to [F.L.S.]" According to the affidavit, R.S. explained to the Department that the lapse in the child's attending treatment and medical appointments was because R.S. had been informed that F.L.S.'s medical insurance was no longer valid.

According to the affidavit, the Department received a third referral on January 25, 2017, alleging neglectful supervision by the paternal grandparents and that F.L.S. "is having abnormal symptoms/accelerated growth and developing sex characteristic[s] possibly due to step grandfather's use of hormones." The affidavit also alleged that on February 9, 2017, the Department received a fourth referral by a mandatory reporter alleging physical abuse of sixteen-month-old F.L.S. by the grandparents, and that F.L.S. has Down syndrome and had been admitted to Memorial Hermann Children's Hospital due to "dangerously high levels of testosterone, namely, 900 when the number should be at zero, and the very most for a male child in puberty is 46." According to the affidavit, the child's testosterone levels were reported in the medical records of the child. Additionally, R.H. reported to the medical providers that he had switched from using testosterone cream to injecting testosterone.

According to the affidavit, R.H. denied prior CPS involvement but the Department representative learned that R.H. "has CPS history regarding sexual abuse of a juvenile male, unrelated household member as late as March 2016." The affidavit indicates that while the child was getting treatment at the Memorial Hermann Children's Hospital, a Department representative met with the hospital staff and due to the decreasing of testosterone levels after admission to the hospital,

a safety plan was put in place prohibiting R.H. from having contact with F.L.S. until the Department's investigation was completed. While hospitalized, F.L.S.'s testosterone levels dropped, but the rate slowed down and the medical staff expressed concerns that F.L.S.'s "voice remains deep and gravelly; she has pronounced muscles, and virilized genitals with Tanner Stage III pubic hair and a grossly enlarged clitoris resembling a penis." The affidavit states that medical testing on F.L.S. had been performed to rule out medical/genetic causes of the high testosterone levels. The affiant noted that R.S., the paternal grandmother, "has not yet seemed able to believe that the step grandfather's testosterone use could be responsible for [F.L.S.]'s virilization." The affiant also concluded:

> The child's medical team has immediate, grave concerns for [F.L.S.]'s health, as she is at severe risk of heart and liver disease and stroke; and as her condition is likely to become permanent with delayed surgical intervention, although her deep voice and advanced muscle-mass are, at this point, believed to be irreversible. Notwithstanding, the child is ready to be discharged from the hospital, however, with many critically necessary follow-up appointments, tests and procedures. To insure the health and safety of the child and to prevent immediate and ongoing danger to her, it is necessary for the Department to be named the Temporary Managing Conservator of [F.L.S.] until a full adversary hearing can be held.

The appellate record shows R.S. was served with the Original Petition. According to the record, R.S. did not file an answer. The trial court signed an Order for Protection of a Child in an Emergency and Notice of Hearing, naming the

5

Department F.L.S.'s temporary sole managing conservator and finding that "there is an immediate danger to the physical health or safety of the child or the child has been the victim of neglect or sexual abuse or trafficking . . . on one or more occasions and that continuation in the home of [J.S., J.W., R.S., or R.H.] would be contrary to the child's welfare[.]" On April 11, 2017, an Affidavit of Voluntary Relinquishment of Parental Rights to the Department of Family and Protective Services signed by J.W. and an Affidavit of Waiver of Interest signed by J.S were filed.

On April 24, 2017, the trial court signed a Final Order of Termination in Suit Affecting the Parent-Child Relationship, terminating the parental rights of J.W. and J.S. as to the child, and appointing the Department as the child's permanent managing conservator. An attorney filed an appearance in the matter on behalf of R.S. on May 23, 2017.

On September 20, 2017, R.S. filed an Original Petition in Intervention for Conservatorship of a Child and Motion for Special Exceptions to Petitioner's Original Pleading, asserting, among other things, that R.S. has standing to intervene, she was not allowed in the courtroom during the adversary hearing, she was unaware of the termination of F.L.S.'s parents' rights until the status hearing on June 8, 2017, that she did not receive proper notice of court proceedings, and that the court should grant her possession and access to the child. The Department filed a motion to strike

the petition in intervention, arguing R.S. did not have standing to intervene and that it was in F.L.S.'s best interest that the court strike the petition in intervention. On October 16, 2017, R.S. filed an Amended Original Petition in Intervention for Conservatorship of a Child asserting additional grounds for standing, and R.S. subsequently filed a Supplement to her amended petition and alleged a failure of service and notice of some of the proceedings.

On October 18, 2017, the trial court held a hearing on the Department's motion to strike R.S.'s petition in intervention and the trial court granted the motion and struck the intervention. On October 24, 2017, R.S. filed a notice of appeal indicating that she was appealing the Final Order of Termination in Suit Affecting the Parent-Child Relationship, as well as the Order Granting Petitioner's Motion to Strike Original Petition in Intervention for Conservatorship of a Child. On October 26, 2017, the trial court signed an order granting the motion to strike and dismissing R.S.'s petition in intervention. On November 2, 2017, R.S. filed her request for findings of fact and conclusions of law in the trial court. We have no findings of fact or conclusions of law in our appellate record pertaining to the Motion to Strike.

## Issue on Appeal

On appeal, R.S. argues that the trial court erred in appointing the Department as F.L.S.'s Managing Conservator because the Department failed to provide R.S.

7

timely notice of the following: the Department's intent to remove the child, removal proceedings, the initial adversary hearing, and any hearing subsequent to service of citation of the original suit. According to R.S., these "failures" resulted "in irreparable harm to appellant as a party and custodian of the child prior to this determination[.]"

Although her notice of appeal asserts she is appealing not only the Final Order of Termination in Suit Affecting the Parent-Child Relationship, but also the Order Granting Petitioner's Motion to Strike Original Petition in Intervention for Conservatorship of a Child, her issues on appeal do not specifically challenge the Order Granting Petitioner's Motion to Strike Original Petition in Intervention for Conservatorship of a Child. Accordingly, Appellant failed to brief any issues pertaining to that order. *See* Tex. R. App. P. 33.1(a), 38.1(i).[3]

With respect to R.S.'s appeal of the Final Order of Termination in Suit Affecting the Parent-Child Relationship, we conclude that her appeal is untimely. R.S. filed her notice of appeal in October of 2017, and the Order was signed on April 24, 2017.

---

[3] We need not determine whether R.S. has standing to intervene. *See* Tex. R. App. P. 47.1. We note that although R.S. was initially listed as "guardian" in the Department's original petition, nothing in our record indicates that R.S. was ever named as F.L.S.'s legal guardian.

A party that seeks to alter a trial court's judgment must file a timely notice of appeal. Tex. R. App. P. 25.1(c), 26.1. The appeal of a parental termination case is an accelerated appeal. Tex. Fam. Code Ann. §§ 109.002(a) (West Supp. 2017), 263.405(a) (West 2014); Tex. R. App. P. 28.4(a). The notice of appeal in an accelerated appeal must be filed within twenty days of the signing of the order. Tex. R. App. P. 26.1(b). For good cause, an appellant is entitled to a fifteen-day extension of the deadline under 26.1(b). Tex. R. App. P. 26.3; *Verburgt v. Dorner*, 959 S.W.2d 615, 617 (Tex. 1997). A timely filing of a notice of appeal invokes the jurisdiction of the court of appeals. Tex. R. App. P. 25.1(b); *see Garza v. Hibernia Nat'l Bank*, 227 S.W.3d 233, 233 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ("[I]f the notice of appeal is not timely filed, the court of appeals is without jurisdiction to consider the appeal.").[4] Appellant's notice of appeal was filed well in excess of the respective timetables outlined in the applicable rules, and it was untimely and failed to invoke our jurisdiction.

---

[4] The rules provide a procedure that enables a trial court to change the date the appellate timetable begins to run from the actual date of the order, to the date on which the party or the party's attorney either received the clerk's notice or acquired actual knowledge that the trial court signed the order, whichever occurs first, as long as that date is not more than ninety days after the trial court signed the order. *See* Tex. R. Civ. P. 306a(4), (5); *Pilot Travel Ctrs., LLC v. McCray*, 416 S.W.3d 168, 176 (Tex. App.—Dallas 2013, no pet.). Although R.S. argues she did not get notice of the termination order until June 8, 2017, we note that she did not seek an extension under Rule 306a.

Accordingly, we must dismiss R.S.'s appeal of the Final Order of Termination in Suit Affecting the Parent-Child Relationship for lack of jurisdiction. *See* Tex. R. App. P. 42.3(a). We affirm the trial court's Order Granting Petitioner's Motion to Strike Original Petition in Intervention for Conservatorship of a Child.

DISMISSED IN PART; AFFIRMED IN PART.


_____
LEANNE JOHNSON
Justice


Submitted on February 14, 2018
Opinion Delivered April 19, 2018

Before Kreger, Horton, and Johnson, JJ.